NOT FOR PUBLICATION                                                                CLOSED

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| DR. ALEXANDER THOMASIAN, | : |
| Plaintiff, | : |
| | : Civil Case No. 08-2218 (FSH) |
| v. | : |
| | : **OPINION** |
| NEW JERSEY INSTITUTE OF TECHNOLOGY, | : |
| | : Date: March 16, 2010 |
| Defendant. | : |

**HOCHBERG, District Judge**

This matter comes before the Court upon Defendant New Jersey Institute of Technology's ("NJIT") November 13, 2009 Motion for Summary Judgment. The Court has made its determination after considering the written submissions of the parties and without oral argument pursuant to Fed. R. Civ. P. 78.

**I.     Summary of Relevant Facts**

Plaintiff Alexander Thomasian was hired at age 54 as a full-time professor in the Department of Computer and Information Science by Defendant NJIT on May 2, 2000. He was hired at the recommendation of the Department Committee on Promotion and Tenure ("Department Committee"), comprised of the Department Chairman and the tenured full professors in that department. He was initially hired into a four-year tenure track position that would lead him to be considered for tenure in his third year of teaching in the 2002-2003 school year. Then, on June 30, 2001, per his request, Dr. Thomasian was granted a change to the seven-year tenure track, making him eligible for tenure consideration in his fifth year of teaching, the

2004-2005 school year and, if he was not granted tenure that year, also eligible for consideration in his sixth year, the 2005-2006 school year.

Dr. Thomasian was given his first annual review on May 10, 2001. At that review, it is agreed that several areas of improvement were discussed, including his teaching evaluations. After Dr. Thomasian's second annual review on May 23, 2002, he received an email from the Chairman of the Computer Science Department with an evaluation that stated that the Committee was "satisfied with [his] initial activities in advising PhD students, ...journal publications, and ... grant work" but "there were difficulties observed in the following areas: Teaching is unsatisfactory [as measured by the Teaching Evaluations per university requirement.]."[1]

In Dr. Thomasian's third year of teaching there was a mandatory intensive review to determine whether he was on track to receive tenure and whether his employment would be continued. After that review, the Chairman of the Computer Science Department wrote a report that stated that he had voted "no" on continuing Dr. Thomasian's employment at that time due to deficient teaching, but that after hearing of "intervention" and "guidance" by other professors to assist Dr. Thomasian in improving his teaching, the Chairman wrote "I am much more optimistic about the outcome on this key requirement for this candidate ... and I am optimistic that there will be significant improvements in his teaching evaluations."[2] The Department Committee report also noted that while Dr. Thomasian was an "outstanding researcher" and a "brilliant thinker," he had "low teaching evaluations" and he had been assigned two other professors as mentors to revise his materials and observe him in class to recommend "how to become more

---

[1] Cert. of Tricia B. O'Reilly in Support of Deft. Mtn. for Summ. Jud. at Ex. G.

[2] Cert. of Tricia B. O'Reilly in Support of Deft. Mtn. for Summ. Jud. at Ex. J.

accessible to students." The Committee felt that "Dr. Thomasian will be able to turn around his teaching evaluations," that "[h]is status as an internationally known researcher justifies that we give him a chance to improve his teaching," and that "[t]he active involvement of his colleagues will direct him to properly make the necessary adjustments."[3]

Dr. Thomasian understood that he needed to improve his teaching. However, in his fourth year evaluation, a new Chairman of the Computer Science Department stated ongoing concerns that Dr. Thomasian "needs to improve his interactions with the students."[4] When, pursuant to department policy, Dr. Thomasian submitted his CV for initial consideration for tenure at the start of his fifth year of teaching, the Department Committee responded that they "decided not to consider [him] for tenure this year" because he needed "more journal papers published or accepted for publication," "more grants," and "improved teaching evaluations."[5]

In Dr. Thomasian's fifth year reviews, the Chairman of the Computer Science Department stated that he "works hard but he needs to have better relationships with colleagues," and in a more detailed report, wrote "he needs to improve his interaction with his students to be more student centered both in and out of the classroom," "needs to be more aggressive on grants," and "needs to try and improve his journal publication record."[6] Dr. Thomasian's teaching evaluations from students had been slightly higher immediately following his intensive

---

[3] Cert. of Tricia B. O'Reilly in Support of Deft. Mtn. for Summ. Jud. at Ex. K.

[4] Cert. of Tricia B. O'Reilly in Support of Deft. Mtn. for Summ. Jud. at Ex. N.

[5] Cert. of Tricia B. O'Reilly in Support of Deft. Mtn. for Summ. Jud. at Ex. Q.

[6] Cert. of Tricia B. O'Reilly in Support of Deft. Mtn. for Summ. Jud. at Ex. O.

third year review, but returned to lower scores by 2004.[7] Dr. Thomasian also does not dispute that he had "disagreements with colleagues."[8]

According to the NJIT Faculty Handbook, the general considerations for tenure include (A) Teaching Effectiveness, (B) Accomplishment, (C) Relevance [of the Accomplishments], and (D) Evaluation of Teaching, Research, Scholarship, Professional Practice and Service (which includes (a) student evaluations of teaching, (b) a vita of all journal papers, conference papers, books and chapters published, (c) service to the university via committees and any additional outside professional society activities).[9] The explanation of "Teaching Effectiveness" in the Handbook reads "As teaching is central to the purpose of the New Jersey Institute of Technology, its effective practice is an essential and primary criterion in the evaluation of the qualifications of an individual for appointment or advancement."[10]

In December of 2005, Dr. Thomasian, age 59 at the time, was given a full evaluation for tenure based on a submitted portfolio. On December 20, 2005, the Department Committee voted 5-2 against granting Dr. Thomasian tenure.[11] At least five of the people who were on the Department Committee that declined to grant him tenure in 2005 were on the Department Committee that had hired him in 2000 at age 54.[12] Dr. Thomasian appealed the decision and it

---

[7] Cert. of Tricia B. O'Reilly in Support of Deft. Mtn. for Summ. Jud. at Ex. CC.

[8] Pl. Resp. to Deft. Statement of Undisputed Facts at ¶ 31.

[9] Cert. of Tricia B. O'Reilly in Support of Deft. Mtn. for Summ. Jud. at Ex. C, pp. 12-13.

[10] *Id.* at 12.

[11] Cert. of Tricia B. O'Reilly in Support of Deft. Mtn. for Summ. Jud. at Ex. D.

[12] The professors identified as on the Department Committee in December of 2005 were Jason Wang, Frank Shih, Joseph Leung, James Geller, Yehoshau Perl, Ali Mili, Boris Verkovski,

was affirmed by the Department Committee on January 20, 2006. The appeal then went to the University Committee on Promotion and Tenure, which affirmed the Department Committee decision on April 6, 2006. The letter from Human Resources notifying Dr. Thomasian of the denial of tenure and offer of a one year terminal position for 2006-2007 stated that his "record in teaching, service, and funded research, does not warrant that [he] be granted tenure."[13]

Dr. Thomasian filed an internal grievance at NJIT in regard to his denial of tenure on May 4, 2006. His grievance was denied and he appealed at two different levels within the university, but both appeals were denied as well, with a final decision from the Academic Process Review Committee ("APRC") filed on May 24, 2007. One of the issues raised by Plaintiff in the instant action, that the Department Committee did not keep written records of its deliberations in Dr. Thomasian's tenure review, was discussed at length in these grievance proceedings with the APRC finding that no violations of university policy had occurred. Age discrimination was not mentioned as a concern or allegation as part of the grievance or appeal processes. Dr. Thomasian filed this suit alleging age discrimination in May 2008.

During the time that Dr. Thomasian was at NJIT, the Computer Science Department hired a number of new faculty members into various positions. Plaintiff, using only initials to identify the individuals, asserts that thirty seven individuals who were more than twenty years younger than the Plaintiff were hired by NJIT during the time that Dr. Thomasian was employed at NJIT, mostly into adjunct professor positions, not tenure-track positions, making significantly lower

---

and maybe James McHugh. Documents submitted to the Court indicate that all of these professors were over age 40 at the time of the Committee's decision.

[13] Cert. of Tricia B. O'Reilly in Support of Deft. Mtn. for Summ. Jud. at Ex. W.

salaries than Dr. Thomasian. Plaintiff also notes that during Dr. Thomasian's time with NJIT, nine other faculty members were granted tenure, one of whom was age 39 at the time he was granted tenure in 2006. He does not allege that these grants of tenure in any way precluded Dr. Thomasian from also getting tenure in his specialty.

**II.     Legal Analysis**

**A.     Summary Judgment Standard**

Pursuant to Fed. R. Civ. P. 56(c), a motion for summary judgment will be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In other words, "summary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." *Miller v. Indiana Hosp.*, 843 F.2d 139, 143 (3d Cir. 1988). A fact is material if it might affect the outcome of the case, and an issue is genuine if the evidence is such that a reasonable fact finder could return a verdict in favor of the nonmovant. *Anderson*, 477 U.S. at 248; *In re Headquarters Dodge*, 13 F.3d 674, 679 (3d Cir. 1993).

All facts and inferences must be construed in the light most favorable to the non-moving party. *Peters v. Delaware River Port Auth.*, 16 F.3d 1346, 1349 (3d Cir. 1994). The party seeking summary judgment always bears the initial burden of production. *Celotex Corp.*, 477 U.S. at 323. This requires the moving party to establish either that there is no genuine issue of material fact and that the moving party must prevail as a matter of law, or to demonstrate that the

non-moving party has not shown the requisite facts relating to an essential element of an issue for which it bears the burden. *See id.* at 322-23. Once the party seeking summary judgment has carried this initial burden, the burden shifts to the non-moving party. To avoid summary judgment, the non-moving party must demonstrate facts supporting each element for which it bears the burden, and it must establish the existence of "genuine issue[s] of material fact" justifying trial. *Miller*, 843 F.2d at 143; *see also Celotex Corp.*, 477 U.S. at 324.[14]

**B.     Discussion**

Plaintiff's remaining claim in this suit is a claim of employment discrimination based on age in the decision by NJIT to deny Dr. Thomasian tenure, brought under the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-1, *et seq*.

According to the New Jersey Supreme Court, "[i]n trying to define the burden that must be met to show discrimination through disparate treatment, we have adopted a three step procedure: (1) the plaintiff must come forward with sufficient evidence to constitute a prima facie case of discrimination; (2) the defendant then must show a legitimate non-discriminatory reason for its decision; and (3) the plaintiff must then be given the opportunity to show that defendant's stated reason was merely a pretext or discriminatory in its application." *Dixon v. Rutgers, The State University of New Jersey*, 110 N.J. 432, 442 (1988) (internal citations omitted). New Jersey thus follows the federal Title VII *McDonnell Douglas Corp. v. Green*, 411

---

[14] If a moving party satisfies its initial burden of establishing a prima facie case for summary judgment, the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* at 587 *(quoting First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

U.S. 792, 807 (1973) framework in cases of employment discrimination.

### (1) *Prima Facie* Case

In a "tenure denial"case, a *prima facie* case of age discrimination in New Jersey requires a plaintiff to prove by a preponderance of the evidence that he (1) belongs to a protected class; (2) was sufficiently qualified to be among those persons from whom a selection for tenure would be made and yet was denied;[15] and (3) that tenure positions in the pertinent department were open and filled by others around the same time that Plaintiff was denied tenure. *Roebuck v. Drexel University*, 852 F.2d 715, 726 (3d Cir. 1988) (citing *Banerjee v. Board of Trustees of Smith College*, 648 F.2d 61, 62 (1st Cir. 1981); *see also Dixon*, 110 N.J. at 443.

Dr. Thomasian was a member of the protected class of people older than 40 when he was denied tenure. However, he was also 54 years old when he was initially hired into the tenure-track position. Taking the facts in the light most favorable, Dr. Thomasian was arguably qualified for his position in that he was hired for it and had been performing in it for several years, albeit with significant performance problems.[16] Dr. Thomasian was not granted tenure and

---

[15] The full quote in *Roebuck* is that Plaintiff "need only show that he was sufficiently qualified to be among those persons from whom a selection, to some extent discretionary, would be made. That is, he need show only that his qualifications were at least sufficient to place him in the middle group of tenure candidates as to whom both a decision granting tenure and a decision denying tenure could be justified as a reasonable exercise of discretion by the tenure-decision making body." 852 F.2d at 726 (quoting *Banerjee v. Board of Trustees of Smith College*, 648 F.2d 61, 63 (1st Cir. 1981) (citations omitted), *cert. denied*, 454 U.S. 1098 (1981).

[16] The Court gives the non-moving party the benefit of the doubt in finding that Mr. Thomasian was qualified for his position because he was repeatedly admonished for his teaching performance, which as the Faculty Handbook states, is without question a "key" qualification. However, a New Jersey court has found that in order to meet this second prong "all that is necessary is that the plaintiff produce evidence showing that she was actually performing the job prior to the termination" in order to meet the *prima facie* test. *Zive v. Stanley Roberts*, 182 NJ 436, 454 (2005). Therefore, the Court will move forward past the *prima facie* case on this prong.

thus his position became a terminal contract position. Perhaps the most difficult prong for Plaintiff is the last prong. While Plaintiff does state that one employee was granted tenure in the "College of Computer Science" in 2006 at age 39, he does not present any facts supporting a reasonable inference that this professor got tenure instead of Dr. Thomasian or that in any manner this younger faculty member "replaced" Dr. Thomasian as a tenured professor. Indeed, if Dr. Thomasian had not asked to have his tenure decision delayed, and had instead come up for tenure on his originally scheduled date of the 2002-2003 school year, his tenure decision would have pre-dated this 39 year old's tenure decision by three years.[17] Dr. Thomasian's evidence is not sufficient to meet the *prima facie* case standard.

As a separate and independent basis for its ruling this Court also performs *McDonnell Douglas* analysis.

**(2) Articulation of Non-Discriminatory Reason**

If the Plaintiff had arguably been able to make a *prima facie* showing of discrimination, the burden would then shift to the employer to articulate some legitimate non-discriminatory reason for the adverse employment action. *Chou v. Rutgers, State University*, 662 A.2d 986, 993

---

[17] Plaintiff, citing *Zive*, 182 NJ at 450, argues that for this prong of the *prima facie* case he need only prove that the university hired significantly younger workers to do the "same work" that the Plaintiff was doing, apparently arguing that hiring non-tenure track adjunct professors would be hiring them to do the "same work" that Dr. Thomasian, a tenure-track full professor, was doing. The Court rejects this standard and relies on the tenure-focused standard articulated in *Roebuck*. That thirty seven younger workers hired by NJIT while he was employed at NJIT does not suffice as the evidence necessary to meet this prong. While Plaintiff does identify one younger faculty member who received tenure, he makes no attempt to demonstrate that this faculty member took Plaintiff's teaching responsibilities nor that they both would not have received tenure if they were both found to be qualified. The Court finds that Dr. Thomasian does not meet this third prong of the *Roebuck* test; however, even if he were able to meet it, his evidence on the remainder of the burden-shifting analysis is so clearly deficient that the Court will move on to explain the remainder of the *McDonnell Douglas* analysis.

(N.J. Super. A.D. 1995) (internal citations omitted). If the employer is able to state such a reason, the Plaintiff must then show by a preponderance of the evidence that the employer's action was motivated by discriminatory reasons. *Id.* The Plaintiff retains the ultimate burden of persuasion. *Id.* (citing *Erickson v. Marsh & McLennan Co.*, 569 A.2d 793 (1990); *see also St. Mary's Honor Center v. Hicks*, 113 S.Ct. 2742, 2747-50 (1993).

NJIT has clearly articulated that its reason for refusing to grant tenure to Dr. Thomasian was the Department Committee's evaluation of his teaching performance and other academic difficulties. While certain aspect's of Dr. Thomasian's work, such as his research and service may have been satisfactory, there were clear performance issues that were articulated in evaluation after evaluation of Dr. Thomasian. As the Summary of Facts details, *supra*, Dr. Thomasian was on notice from his first annual review that his teaching was a problem and, after his intensive third year review, he was assigned two faculty mentors to counsel him and help him turn around his unsatisfactory teaching performance. That effort by NJIT was unavailing. However, NJIT made that serious and time-consuming effort when Dr. Thomasian was at least 57 years old, demonstrating its investment in trying to retain Dr. Thomasian.

**(3) Pretext/Inference of Discrimination Analysis**

The burden then falls on Dr. Thomasian to provide evidence that this reason was mere pretext for discrimination based on age. Courts afford deference to the decisions of an academic institution with regard to the promotion and tenure of their professors. *See Kunda v. Muhlenberg College*, 621 F.2d 532, 548 (3d Cir. 1980).[18] Because of this deference, the Court will not

---

[18] "...courts must be vigilant not to intrude into that determination, and should not substitute their judgment for that of the college with respect to the qualifications of faculty members for promotion and tenure. Determinations about such matters as teaching ability,

examine in detail, for example, how many papers Plaintiff published or how much grant money he brought in. The Faculty Handbook clearly states what factors would be considered in a tenure decision; from his first annual review to his fifth year performance review immediately preceding the department's tenure decision, the computer science department informed Dr. Thomasian on numerous occasions that he was performing below expectations, especially in his teaching duties. Dr. Thomasian acknowledges that he understood that the department was not satisfied with his performance, especially in the area of teaching and being accessible to students.

In cases such as this, where the Plaintiff was both hired and fired while a member of the protected class of people over age 40, there is a presumption against age discrimination as a motivating factor for termination. *See Young v. Hobart West Group*, 897 A.2d 1063, 1070 (N.J. Super. 2005); *Lowe v. J.B. Hunt Transport, Inc.*, 963 F.2d 173, 174-75 (8th Cir. 1992).[19] This presumption is further supported when the same individuals are responsible for the hiring and the firing of the Plaintiff, *see Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991), and when the individuals responsible for the firing are also in the protected class, *see Young*, 897 A.2d at 1070 (citing *Richter v. Hook-SupeRx, Inc.*, 142 F.3d 1024, 1032 (7th Cir. 1998).

---

research scholarship, and professional stature are subjective, and unless they can be shown to have been used as the mechanism to obscure discrimination, they must be left for evaluation by the professionals..." *Kunda*, 621 F.2d at 548.

[19] The Court in *Lowe* noted "[t]he most important fact here is that plaintiff was a member of the protected age group both at the time of his hiring and at the time of his firing, and that the same people who hired him also fired him. If plaintiff had been forty when he was hired, and sixty-five when he was fired, obviously this fact would not be so compelling. But here, the lapse of time was less than two years. It is simply incredible, in light of the weakness of plaintiff's evidence otherwise, that the company officials who hired him at age fifty-one had suddenly developed an aversion to older people less than two years later." *Lowe*, 963 F.2d at 174-75 (internal citations omitted).

Dr. Thomasian argues that his age was the reason he was not granted tenure; however he was hired at age 54 into a tenure track plan that was originally designed to have him reviewed for tenure at age 58, only four years later. He was ultimately denied tenure at age 60. While the Chairman of the Department of Computer Science did change during Dr. Thomasian's time at the university, the previous Chairman had also voted against renewing Dr. Thomasian's position during his third year review. The majority of the other members of the Department Committee were the same at the time Dr. Thomasian was denied tenure as when he was hired. In addition, the professors on the Department Committee that denied Dr. Thomasian's tenure were older than 40 themselves when they were making the tenure decision. Moreover, these professors on the Department Committee undertook to help Dr. Thomasian achieve tenure by giving him more time and mentoring assistance to improve his teaching skills, which is a major focus of NJIT.

Even absent these many presumptions against an inference of discrimination, Dr. Thomasian has not proffered any genuine or material evidence from which a reasonable jury could infer that NJIT's proffered reason for denying him tenure was pretextual. While Dr. Thomasian disputes whether there were clear standards regarding scores for teaching evaluations, he does not dispute that he was clearly and repeatedly warned that his teaching performance was sub-par and that he would need to significantly improve it before his second tenure review in order to be considered favorably for tenure. It is entirely clear from the Faculty Handbook that teaching performance is a key criteria for tenure decisions. There is no question of material fact that Dr. Thomasian knew that his teaching skills and ability to interact with students were viewed by the department as a significant problem that he needed to redress, and that he did not do so.

While Dr. Thomasian cites general information about younger faculty members being

hired, he does not proffer genuine or material evidence about these younger faculty members that would support an inference of discrimination based on age in the denial of tenure to Dr. Thomasian.  He cites the fact that many younger faculty were hired while he was working at NJIT, a rather unremarkable fact when one considers that Dr. Thomasian was already 54 when he was hired at NJIT.  Most new faculty could be expected to start their academic careers younger than 54, so almost everyone recently hired while Dr. Thomasian was between 54 and 60 would naturally be much younger, and this would not lead to a reasonable inference of discrimination.  In fact, Plaintiff points out the fact that many of these younger faculty members were hired into adjunct or other positions that were inferior to the tenure-track full professor position that Dr. Thomasian held.

While Plaintiff also states that nine faculty members were granted tenure while he worked at NJIT, he does not aver demographic information about these nine faculty members, other than to point to one professor who was granted tenure in 2006 at age 39 who earned a lower salary than Plaintiff.[20]  Plaintiff does not provide any other comparative information about the qualifications of this other professor who was granted tenure in order to support an inference that the reason that he got tenure, and Dr. Thomasian did not, was age.[21]

---

[20] Plaintiff also states that upon information and belief there was another faculty member, age 38 at the time, who was granted tenure in 2005 who is no longer with NJIT, but this is not reflected in the Faculty Schedule and no further information is provided about this faculty member.

[21] *See Dixon*, 110 N.J. at 443 ("Although '[c]omparisons may be more difficult in the case of professional and academic employment decisions ... they may be essential to a determination of discrimination; and where they are, and where the evidence is available, they must be made.'") (quoting *Namenwirth v. Bd. of Regents of Univ. of Wis. System*, 769 F.2d 1235, 1241 (7th Cir.1985), *cert. den.*, 474 U.S. 1061 (1986)).

Without more, these facts regarding other younger faculty members do not raise a reasonable inference of age discrimination. This finding is buttressed by the line of cases following the Supreme Court's decision in *Hazen Paper Co. v. Briggs*, 507 U.S. 604 (1993), which held that even if a university hired younger faculty in order to pay lower salaries and thus save money, that does not raise an inference of age discrimination under the federal age discrimination act.[22] Here, Plaintiff has provided no genuine or material evidence that the thirty seven younger (mostly adjunct) professors were employed because of their youth, rather than their lower salaries or other non-discriminatory motives.

Taking the facts and inferences in the light most favorable to him, Dr. Thomasian has not presented sufficient evidence to meet his burden under prong 3 of the *McDonnell Douglas* analysis. There are no genuine facts in dispute that are material to this determination from which a reasonable jury could infer that NJIT's true motive was age discrimination in its tenure decision. A finding of age discrimination by a jury, based on the record presented here, would not be reasonable.

**III.    Conclusion**

For the reasons set forth in this Opinion, Defendant NJIT's Motion for Summary Judgment is granted. An appropriate Order will issue.

/s/ **Faith S. Hochberg**

Hon. Faith S. Hochberg, U.S.D.J.

---

[22] *See, e.g.*, *Sperling v. Hoffman-La Roche, Inc.*, 924 F.Supp. 1396, 1404 (D.N.J. 1996) (firing an employee because of his high salary does not state a cause of action under the ADEA); *Geiger v. AT&T Corp.*, 962 F.Supp. 637, 643-44 (E.D. Pa. 1997) (age discrimination claims based on factors positively correlated with age have been rejected).